**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | |
|---|---|
| Ronald Courtney, Jacque Courtney, Robert Keith Courtney, Angela Courtney, Elmer Bass, and Teresa Courtney Bass,  Plaintiffs,  v.  Ingersoll-Rand Company, The Timken Company, and Timken US LLC, f/k/a Timken US Corporation, f/k/a The Torrington Company,  Defendants. | C.A. No. 8:09-cv-01871-JMC  **OPINION AND ORDER** |

This matter is before the court on Ingersoll-Rand Company ("Ingersoll-Rand"), The Timken Company, and Timken US LLC's ("Defendants") Motion for Summary Judgment [Doc. # 36-1] as to Plaintiffs Ronald and Jacque Courtney's claims for recovery of response costs, indemnity, declaratory judgment, and strict liability; all claims by Plaintiffs Elmer and Teresa Bass; and all claims by Plaintiffs Robert and Angela Courtney. Based on the record before the court, summary judgment is granted in part and denied in part.

**FACTUAL AND PROCEDURAL HISTORY**

Since 1960, The Torrington Company has owned and operated a manufacturing plant at 430 Torrington Road in Walhalla, South Carolina ("the plant"). [Doc. # 36-1, at ¶4]. In 1969, Ingersoll-Rand purchased all of the company's stock, but The Torrington Company continued to

1

own and operate the Walhalla plant. *Id.* at ¶6. In 2003, The Timken Company purchased The Torrington Company and changed the plant's name to "Timken US Corporation." *Id.* at ¶15.

The plant initially produced needles for the textile industry and used vapor degreasers, trichloroethylene (TCE), and 1,1,1-trichloroethane (TCA) to clean the needles. *Id.* at ¶4, 5. TCE and TCA are both chlorinated solvents. *Id.* at ¶4. In the late 1970s and early 1980s when the plant phased out needle production and began producing automotive bearings, it stopped using vapor degreasers. *Id.* at ¶7. In 1991, it stopped all major use of chlorinated solvents, but as late as 2000, still used minor amounts as ingredients in other products. *Id.* at ¶8. In 2003, it completely stopped all use of the solvents. *Id.* at ¶9.

Plaintiffs Ronald and Jacque Courtney purchased Tax Parcel 500-09-01-001 ("Parcel 1") in 1983, and Tax Parcel 500-05-01-002 ("Parcel 2") in 1990. *Id.* at ¶11, 12. The tracts are immediately west of, and adjacent to, the plant and include a lake known as "Browns Lake." *Id.* at ¶10. After the purchase, the Courtneys developed a portion of the property into a residential subdivision known as Hidden Lake Estates and conveyed lots to two of their children and their spouses, Plaintiffs Elmer and Teresa Bass and Plaintiffs Robert and Angela Courtney. [Doc. # 45, at 2]. Elmer and Teresa Bass's lot is across the street from Browns Lake and Robert and Angela Courtney's lot is adjacent to Browns Lake. *Id.* When Ronald and Jacque conveyed the lots to their children, they indicated orally that the couples, their children, their tenants, and any purchasers had the right to use and enjoy Browns Lake. *Id.* They "did not believe they needed to put this agreement in writing, but would have done so—and still would do so—if they or any of their tenants or purchasers requested documentation of [the] agreement." *Id.*

Ronald and Jacque Courtney allegedly purchased Parcel 1 and Parcel 2 with the expectation that they would be able to use and enjoy Browns Lake. *Id.* at 3. Moreover, Robert

2

and Angela Courtney, and Elmer and Teresa Bass allegedly built their homes on the property with the expectation that they would be able to use and enjoy Browns Lake. *Id.* From 1985 to October 2006, Plaintiffs used Browns Lake for swimming, irrigating, fishing, boating, skiing, and other recreational activities. *Id.*

In 2004, Sanborn, Head & Associates ("Sanborn Head"), an environmental consulting firm, performed a site investigation at the plant. [Doc. # 36-1, at ¶18]. In late December 2004, Sanborn Head verbally reported concentrations of chlorinated solvents above EPA-established Maximum Contaminant Levels in groundwater at the plant site. *Id.* at ¶19. Sanborn Head provided a written report of its findings on January 21, 2005 and forwarded the report to the South Carolina Department of Health and Environmental Control ("DHEC"). *Id.* at ¶20.

In 2005, Ingersoll-Rand retained Environmental Resources Management, Inc. ("ERM"), an environmental consulting firm, and ERM submitted a Site Assessment Work Plan to DHEC. *Id.* at ¶22, 23. After installing groundwater monitoring wells and taking samples, ERM discovered concentrations of chlorinated solvents above drinking water standards in wells near the plant's property boundary and determined that an investigation of possible off-site contamination was needed. *Id.* at ¶24.

In July 2006, Ingersoll-Rand entered into a Consent Agreement with DHEC requiring Ingersoll-Rand to (1) submit a groundwater assessment plan to delineate the horizontal and vertical extent of contaminants at the site; (2) upon DHEC approval of the assessment plan, implement the assessment plan and approved monitoring program; (3) assess the extent of soil and groundwater contamination to the fullest degree possible in accordance with the DHEC-approved assessment plan; (4) after completion of the assessment, submit a Final Assessment Report, including a complete delineation of the soil and groundwater impacts; (5) after DHEC

approval of the Final Assessment Report, submit a Corrective Action Plan; and (6) after DHEC approval of the Corrective Action Plan, implement the Corrective Action Plan. *Id.* at ¶25. Ingersoll-Rand has completed all tasks required by the Consent Agreement except implementation of the Corrective Action Plan. *Id.* at ¶26.

"Groundwater with chlorinated solvents in excess of drinking water standards has been discovered on the undeveloped parcel owned by Ronald and Jacque Courtney" and "[s]urface water with chlorinated solvents in excess of drinking water standards has been discovered in Browns Lake." *Id.* at ¶29–30. Defendants allege that neither Robert and Angela Courtney nor Elmer and Teresa Bass own property that is contaminated. *Id.* at 10, 12.

In August 2006, ERM provided copies of its sampling results to Ronald and Jacque Courtney. *Id.* at ¶27. Upon discovering that Defendants released hazardous substances onto their property, Ronald and Jacque Courtney hired Hart & Hickman, P.C. ("Hart & Hickman") and Entrix, Inc. ("Entrix") to "investigate and report on the sources and extent of the contamination, Defendants' proposed remediation plan, and remediation alternatives." *Id.* at 4. Both firms issued, reports and Entrix "submitted a request to [DHEC] for additional investigation." *Id.* Ronald and Jacque Courtney paid Hart & Hickman $8,372.63 and Entrix $21,076.50 for their services. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). In deciding whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When a motion for summary judgment is properly made, unsupported conclusory allegations do not suffice to create a genuine issue of material fact. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). The non-moving party must show the existence of specific facts which give rise to a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## LAW AND ANALYSIS

### I.    Depreciation in Value and Loss of Use and Enjoyment

Plaintiffs allege that "[a]s a proximate result of environmental contamination caused by Defendants," they have lost the use and enjoyment of their property and it has depreciated in value. [Doc. # 25, at ¶17]. Specifically, Elmer and Teresa Bass allege that "a purchaser would pay 20% less for their property . . . and a lessee would pay $500.00 less to rent their home." [Doc. # 36-1, at 10–11]. Robert and Angela Courtney allege that "a purchaser would pay 40% less for their property . . . and a lessee would pay 40–60% less to rent the property." *Id.* at 12. Defendants allege that neither couple owns property that is contaminated and that their damages are not connected to the contamination of Browns Lake. [Doc. # 36-1, at 11-12]. Thus, to recover, they must show a property right—either a public right of access or a private right of access—in Browns Lake.

The South Carolina Constitution states that "[a]ll navigable water shall forever remain

public highways free to the citizens of the State . . . ." S.C. Const. art. XIV, §4. Moreover, "[a]ll streams which have been rendered or can be rendered capable of being navigated by rafts of lumber or timber by the removal of accidental obstructions and all navigable watercourses and cuts are . . . navigable streams and such streams shall be common highways and forever free . . . ." S.C. Code Ann. § 49-1-10 (2001). A body of water is navigable if it can support "valuable floatage." *White's Mill Colony, Inc. v. Williams*, 363 S.C. 117, 125, 609 S.E.2d 811, 815 (Ct. App. 2005). "Valuable floatage" is not limited to objects of a specific size, but rather includes commercial or recreational traffic that serves any "legitimate and beneficial public use." *Id.* at 125, 609 S.E.2d at 815 (quoting *Medlock v. S.C. Coastal Council*, 289 S.C. 445, 450, 346 S.E.2d 716, 719 (1986)) (internal quotation marks omitted). To be navigable, "the watercourse in question must . . . be connected to other navigable bodies of water such that it forms a means of transportation or conveyance beyond an isolated locality." *Id.* at 126, 609 S.E.2d at 816.

If a body of water is not navigable, the public has no general right to access; an individual has a private right to access, however, if he owns "the fee in land underlying the surface waters." *Id.* at 130, 609 S.E.2d at 818 (quoting *Wehby v. Turpin*, 710 So.2d 1243, 1247 (Ala. 1998)) (internal quotation marks omitted). Such an owner is "entitled to the exclusive control of that portion of the lake lying over the land as to which [he] own[s] the fee." *Id.* at 130, 609 S.E.2d at 818 (quoting *Wehby*, 710 So.2d at 1247) (internal quotation marks omitted).

If an individual does not own "the fee in land underlying the surface waters," he may nevertheless have private right of access in non-navigable waters if an owner with exclusive control grants an easement to him for purposes of accessing the water. An easement is "a right of use over another's property" and can "arise by both express creation and by implication." *Inlet Harbour v. S.C. Dep't of Parks, Recreation, and Tourism*, 377 S.C. 86, 91 659 S.E.2d 151,

154 (2008) (citing *Black's Law Dictionary* 457 (5th ed. 1979); 17A Am. Jur. *Easements* § 37 (1957)).  "The creation of an implied easement generally requires that the facts and circumstances surrounding the conveyance, the property, the parties, or some other characteristic demonstrate that the objective intention of the parties was to create an easement."  *Id.* at 92, 659 S.E.2d at 154 (citing 25 Am. Jur. 2d *Easements and Licenses* § 19 (2004)).

Here, Defendants allege that because Browns Lake lies on a tributary to Cane Creek and "neither Cane Creek nor its tributary is [listed as] a navigable stream" on DHEC's navigable waters map, Browns Lake is non-navigable.  [Doc. # 36-1, at 14].  Plaintiffs allege that because Browns Lake connects to Cane Creek, "which feeds Lake Keowee," and because individuals use Browns Lake for "boating and floating on tubes," the lake is navigable.  [Doc. # 45, at 9]. Moreover, Plaintiffs contend that "whether a waterbody is shown on DHEC's map is not dispositive of the question of whether a waterbody is in fact navigable."  *Id.*

Defendants further allege that because Ronald and Jacque Courtney did not grant Elmer and Teresa Bass, and Robert and Angela Courtney a right of access to Browns Lake in their respective property deeds, neither couple has a private right of access in the lake.  [Doc. # 36-1, at 11–12].  Plaintiffs allege, on the other hand, that because Ronald Courtney admits granting both Elmer and Teresa Bass, and Robert and Angela Courtney permission to use Browns Lake and admits granting "any future tenants or owners of their properties" permission to use Browns Lake, both couples have a valid easement to use the lake.  [Doc. # 45, at 6–7].

Ultimately, Defendants allege that neither Elmer and Teresa Bass nor Robert and Angela have a public or private right to access Browns Lake, and thus purchasers and lessees of their respective properties would also lack a right to access Browns Lake.  [Doc. # 36-1, at 11–12, 14]. Thus, they contend that neither couple can claim "that the alleged contamination of Browns Lake

7

affects the value of their property at all" or "that their property would rent for less." *Id.* at 12.

Based on the evidence before the court, taken in the light most favorable to Plaintiffs, the court finds that genuine issues of material fact exist regarding whether Browns Lake is navigable and whether Elmer and Teresa Bass, and Robert and Angela Courtney have a valid easement to access the lake. Thus, genuine issues of material fact exist regarding whether Elmer and Teresa Bass, and Robert and Angela Courtney have cognizable damages for depreciation of the value of their property and loss of its use and enjoyment. Consequently, with the exception of their claims for recovery of response costs as indicated below, the court denies summary judgment as to the claims by Plaintiffs Elmer and Teresa Bass and Robert and Angela Courtney.

## II.     Recovery of Response Costs

Plaintiffs allege that they have "incurred and will incur necessary response costs [to the release of hazardous substances], which have been and will be consistent with the applicable National Contingency Plan." [Doc. # 1, at ¶21]. Moreover, they allege that "[b]ecause Defendants owned and operated the Facility at times during which hazardous substances were disposed of and released, Defendants are liable under Section 107 of CERCLA, 42 U.S.C. § 9607, for all response costs." *Id.* at ¶22.

Under § 9607(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), "an owner or operator of a . . . facility" is liable for "any . . . necessary costs of response incurred by any . . . person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(2006). CERCLA "allows a private party who has incurred response costs because of a release or threatened release of hazardous materials to bring an action and recover those costs." *Weyerhaeuser Corp. v. Koppers Co., Inc.*, 771 F. Supp. 1406, 1411 (D. Md. 1991); *see also Westfarm Assoc. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d

669, 677 (1995) (citing *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841 (4th Cir. 1992)).  To recover,

> the plaintiff must show that (1) the waste disposal site is a facility within the meaning of 42 U.S.C. § 9601(9); (2) a release or threatened release of a hazardous substance from the facility has occurred; and (3) the release or threatened release has caused the plaintiff to incur response costs that are consistent with the national contingency plan.

*Id.* (quoting *Ret. Cmty. Developers, Inc. v. Merine*, 713 F. Supp. 153, 155 (D. Md. 1989)) (internal quotation marks omitted) (citations omitted).  CERCLA defines "response" as "remove, removal, remedy, and remedial action," 42 U.S.C. § 9601(25), and defines "remove" as "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances . . . ." *Id.* at § 9601(23).

The Fourth Circuit has not directly addressed which costs qualify as "necessary response costs" under CERCLA.  Other circuits have addressed the issue, however, and have held that while costs related solely to litigation are not recoverable response costs, *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 481–82 (6th Cir. 2004); *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 849–50 (3d Cir. 1995), site investigation costs are recoverable response costs.  *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667, 672 (5th Cir. 1989); *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1154 (9th Cir. 1989).

Here, Plaintiffs claim that the money Ronald and Jacque Courtney paid to Hart & Hickman and Entrix to "investigate and report on the sources and extent of the contamination, Defendants' proposed remediation plan, and remediation alternatives" qualifies as a recoverable response cost because both firm's services were investigative and were "directly connected to the cleanup of the contamination caused by Defendants." [Doc. # 45, at 12].  Defendants, on the

9

other hand, claim that the expenses are purely "litigation-related" and "are not compensable as response costs." [Doc. # 36-1, at 17].

Based on the evidence before the court, taken in the light most favorable to Plaintiffs, the court finds that genuine issues of material fact exist regarding whether the money Ronald and Jacque Courtney paid to Hart & Hickman and Entrix qualifies as a recoverable response cost under 42 U.S.C. § 9607(a). Thus, the court denies summary judgment as to Ronald and Jacque Courtney's claim for recovery of response costs.

Plaintiffs have not submitted any evidence that Elmer and Teresa Bass and Robert and Angela Courtney incurred response costs. Thus, the court grants summary judgment as to their claims for recovery of response costs.

## III.    Indemnity

Plaintiffs allege that they are "entitled to indemnification from Defendants for all costs incurred in investigating, responding to, removing and/or abating the spread of the contamination caused by Defendants' activities." [Doc. # 1, at 7–8]. An indemnification claim requires Plaintiffs, as indemnitees, to prove that "(1) the [defendants were] liable for causing the [p]laintiff's damages; (2) the indemnitee[s] [were] exonerated from any liability for those damages; and (3) the indemnitee[s] suffered damages as a result of the [p]laintiff's claims against [them] which were eventually proven to be the fault of the [defendants]." *Fowler v. Hunter*, 380 S.C. 121, 128, 668 S.E.2d 803, 807 (Ct. App. 2008) (quoting *Vermeer Carolina's, Inc. v. Wood/Chuck Chipper Corp.,* 336 S.C. 53, 63, 518 S.E.2d 301, 307 (Ct. App. 1999)) (internal quotation marks omitted).

Here, Plaintiffs allege that "[u]nder CERCLA, the current owners of facilities where a release of hazardous substances has occurred are potentially liable for response costs, even if

they did not cause the release." [Doc. # 45, at 13]. Plaintiffs admit that "no such claims have been asserted against them yet," but allege that they "face the real risk that such claims may be asserted against them." [Doc. #45, at 14]. To achieve indemnification, Plaintiffs must prove that a claim has actually been brought against them and that they have been exonerated for any liability related to that claim. Here, Plaintiffs allege potential claims, but have not shown that an actual claim exists. Thus, Plaintiffs' indemnification claim fails as a matter of law.

## IV.     Declaratory Judgment

Plaintiffs allege that they are entitled to a declaratory judgment that "Defendants are liable in any legal or administrative action that may be brought by any private person" or "by any agencies of the United States Government or any state, including the State of South Carolina, concerning or related to the release of the Toxic Chemicals at the Property." [Doc. # 1, at 9]. Plaintiffs also allege that "[i]n the event [they] are found liable for any or all relief requested in any judicial or administrative action arising out of or related to the release or threatened release . . . such liability is purely secondary to Defendants' liability." *Id.*

"In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting 28 U.S.C. § 2201(a) (2006)) (omissions in original). To "satisfy the case-or-controversy requirement," the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests," it must be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of

facts." *Id.* at 127 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)) (alternation in original).

Plaintiffs admit that no claims have been asserted against them, but that they "face the real risk that . . . claims may be asserted against them." [Doc. # 45, at 14]. As such, Plaintiffs have not satisfied the case-or-controversy requirement and are asking the court to address a hypothetical issue. Thus, their request for declaratory judgment fails as a matter of law.

## V.    Strict Liability

Plaintiffs allege that Defendants are strictly liable because they "engaged in ultra-hazardous and abnormally dangerous activity by handling, storing, and disposing" hazardous chemicals at the plant. [Doc. # 25, at ¶50]. Defendants claim that Plaintiffs' "allegation fails as a matter of law because the handling, storing, and disposing of hazardous chemicals is not an abnormally dangerous activity." [Doc. # 36-1, at 22].

"The extent to which the common law recognizes strict liability is limited to a few narrowly defined categories such as cattle trespass, public callings, certain kinds of nuisances, and ultra-hazardous activities." *Ravan v. Greenville Cnty.,* 315 S.C. 447, 434 S.E.2d 296, 304 (Ct. App. 1993) (citing *Snow v. City of Columbia,* 305 S.C. 544, 409 S.E.2d 797, 800 (Ct. App. 1991)). Although neither the South Carolina legislature nor the South Carolina Supreme Court has "declared that one engaged in handling dangerous chemicals is strictly liable for damages caused by those activities," *Id.* at 305, 409 S.E.2d at 461, the designation of an activity as abnormally dangerous is decided on a case-by-case basis. *Id.* at 305, 409 S.E.2d at 461 (citing *T & E Indus., Inc. v. Safety Light Corp.,* 587 A.2d 1249, 1259 (N.J. 1991)). Moreover, authorities are split regarding whether the judge or the jury should make the decision. *Id.* at 305, 409 S.E.2d at 461 (citing *Erbrich Prods. Co. v. Wills,* 509 N.E.2d 850, 857 (Ind. Ct. App. 1987)).      In

12

*Ravan v. Greenville County*, a South Carolina trial court declined to "charge the jury that the disposal of toxic, cancer-causing chemicals [was] an abnormally dangerous activity as a matter of law" and instead permitted the jury to decide whether the defendants were strictly liable for the disposal of toxic chemicals. *Id.* at 304, 409 S.E.2d at 460. On appeal, the South Carolina Court of Appeals declined to hold that the plaintiffs were prejudiced by the trial court's refusal to give the requested jury instruction. *Id.* at 305, 409 S.E.2d at 462.

Thus, because neither the South Carolina Supreme Court nor the South Carolina Legislature has directly outlined the parameters of an abnormally dangerous activity, and a South Carolina trial court has submitted such a question to a jury, this court declines to hold as a matter of law that Defendants' activities are not abnormally dangerous and denies Defendants' motion for summary judgment on Plaintiffs' strict liability claims.

## CONCLUSION

For the foregoing reasons, the court **grants** summary judgment as to Plaintiffs Ronald and Jacque Courtney's claims for indemnity and declaratory judgment, but **denies** summary judgment as to their claims for recovery of response costs and strict liability. The court also **grants** summary judgment as to claims by Plaintiffs Elmer and Teresa Bass, and Robert and Angela Courtney for recovery of response costs, indemnity and declaratory judgment, but **denies** summary judgment as to all of their other claims.

**IT IS SO ORDERED.**

s/ J. Michelle Childs
United States District Judge

Greenville, South Carolina
January 6, 2011